UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NANCY M. GUERRERO, O/B/O
O.G.S., MINOR,

       Plaintiff,

       v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

       Defendant.

No. 2:13-CV-00284-JTR

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

**BEFORE THE COURT** are cross-motions for summary judgment. ECF No. 18, 22. Attorney Dana C. Madsen represents Plaintiff; Special Assistant United States Attorney Benjamin J. Groebner represents the Commissioner of Social Security (Defendant). The parties have consented to proceed before a magistrate judge. ECF No. 7. After reviewing the administrative record and the briefs filed by the parties, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.

## JURISDICTION

On March 3, 2010,[1] Plaintiff filed an application for supplemental security income on behalf of a child under age 18, with an alleged disability onset date of

---

[1] At the hearing, Plaintiff agreed to amend the onset date to March 3, 2010. Tr. 48.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 1

September 17, 2011.  Tr. 22, 132.  Plaintiff's mother listed her disabling conditions as vision problems caused by albinism, along with breathing problems.  Tr. 125. Plaintiff's claim was denied initially and on reconsideration, and she requested a hearing before an administrative law judge (ALJ).  Tr. 72-116.

On March 16, 2012, ALJ R.J. Payne held a hearing, at which medical expert and pediatrician Mark Thoman, M.D., and Plaintiff's mother Nancy Guerrero, who was represented by counsel, testified.  Tr. 38-85.  On April 19, 2012, the ALJ issued a decision finding Plaintiff was not disabled.  Tr. 22-34.  The Appeals Council declined review.  Tr. 1-3.  The instant matter is before this court pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs of the parties and thus, they are only briefly summarized here.  At the time of the hearing, Plaintiff was four and one-half years old, and lived with her mother and two siblings in Airway Heights, Washington. Tr. 58-59.  Plaintiff's mother, Olivia Guerrero Saenz, applied for benefits on behalf of her daughter, and explained that her oldest child was also born with albinism. Tr. 60.  Ms. Guerrero explained that Plaintiff had trouble with her vision, and she wore glasses, but still had to squint to see.  Tr. 62-65.  Plaintiff has transitional lenses to help her to see outside.  Tr. 65.

Ms. Guerrero said she has to closely watch Plaintiff outdoors and at playgrounds, because Plaintiff often runs into stationary objects and she tends to fall off playground equipment.  Tr. 62-64.  Ms. Guerrero also said Plaintiff's school was in the process of accommodating Plaintiff's vision issues by implementing larger print in the classroom, elevating papers on the desks, moving Plaintiff to the front of the room, using colored paper because it is not as bright as white, and using a projector screen instead of a television screen.  Tr. 63.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 2

**STANDARD OF REVIEW**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The ALJ's determinations of law are reviewed *de novo*, although deference is owed to a reasonable construction of the applicable statutes. *McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir. 2000). The decision of the ALJ may be reversed only if it is not supported by substantial evidence or if it is based on legal error. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance. *Id*. at 1098. Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the evidence is susceptible to more than one rational interpretation, the Court may not substitute its judgment for that of the ALJ. *Tackett*, 180 F.3d at 1097; *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1988). If substantial evidence exists to support the administrative findings, or if conflicting evidence exists that will support a finding of either disability or non-disability, the ALJ's determination is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).

**SEQUENTIAL PROCESS**

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

ORDER GRANTING PLAINTIFF'S MOTION . . . - 3

less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).  The Social Security Administration has enacted a three step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability.  20 C.F.R. § 416.924(a).  First, the ALJ considers whether the child is engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations."  20 C.F.R. § 416.924(c).  Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically equals" or "functionally equals" a disability listed in the regulatory "Listing of Impairments."  20 C.F.R. § 416.924(c)-(d).  An impairment is functionally equivalent to a listed impairment if it results in extreme limitations in one area of functioning or marked limitations in two areas.  20 C.F.R. § 416.926a(a).  An impairment is a "marked limitation" if it "seriously interferes with [a person's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(I).  By contrast, an "extreme limitation" is defined as a limitation that "interferes very seriously with [a person's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(I).

In determining whether an impairment exists, the ALJ assesses the child's functioning in six domains in terms of his/her ability to:  (1) acquire and use information; (2) attend and complete tasks; (3) interact and relate with others; (4) move about and manipulate objects; (5) care for oneself, and (6) his/her general health and physical well-being.  20 C.F.R. § 416.926a(a)-(b) (2001).  In order to demonstrate functional equivalence under the Final Rules, the child must exhibit a marked limitation in two of the domains, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(e)(2)(i).

///

ORDER GRANTING PLAINTIFF'S MOTION . . . - 4

**ALJ'S FINDINGS**

At step one of the sequential evaluation process, the ALJ found Plaintiff has never engaged in substantial gainful activity.  Tr. 25.  At step two, the ALJ found Plaintiff suffered from the severe impairments of albinism; history of recurrent upper respiratory infections with bronchospasm; and history of eye/vision disturbance including nystagmus, macular hypoplasia, and hyperopic astigmatism. Tr. 25.  At step three, the ALJ found Plaintiff's impairments, alone and in combination, did not meet or medically equal one of the listed impairments.  Tr. 26.  With regard to functional equivalence, the ALJ concluded Plaintiff does not have an "extreme" limitation in any domain of functioning or a "marked" limitation in two domains.  Tr. 28-33.  Accordingly, the ALJ concluded Plaintiff was not disabled within the meaning of the Social Security Act.  Tr. 34.

**ISSUES**

Plaintiff argues the ALJ erred at Step Three by finding her impairments do not meet or functionally equal Listing 2.02.  ECF No. 18 at 14.  Alternatively, Plaintiff argues the ALJ erred by failing to find Plaintiff has marked limitations in at least two domains.  ECF No. 18 at 11-13.

**DISCUSSION**

**A.    Listing 2.02**

Plaintiff contends the ALJ erred by finding her impairments do not meet or functionally equal a listed impairment.  ECF No. 18 at 14.

For an impairment or combination of impairments to meet a Listing, all of the criteria of that Listing must be satisfied for the requisite durational period. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (the impairment "must meet all of the specified medical criteria" in the Listing); *see also* 20 C.F.R. §§ 416.909 and 416.925(c)(3); SSR 83-19.  The claimant bears the burden of proving an impairment or combination of impairments meets or equals the criteria of a Listing.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 5

1  *Tackett*, 180 F.3d at 1098-1099.  "An ALJ must evaluate the relevant evidence

2  before concluding that a claimant's impairments do not meet or equal a listed

3  impairment."  *Lewis v. Apfel,* 236 F.3d 503, 512 (9th Cir. 2001).

4      In order to be considered disabled under Listing 2.02, a claimant must show

5  that she has a loss of central visual acuity and that the remaining vision in her

6  better eye, after best correction, is 20/200 or less.  20 C.F.R. Pt. 404, Subpt. P,

7  App. 1, Part A § 2.00(A)(4)(b)(ii).

8      On April 26, 2010, Plaintiff was examined by Quinn Smith, M.D., at

9  Northwest Pediatric Ophthalmology.  Tr. 260-261.  Dr. Smith found that Plaintiff

10 had nystagmas, astigmatism, albinism, and macular hypoplasia.  Tr. 261.  On

11 September 7, 2010, Plaintiff was again examined at Northwest Pediatric

12 Ophthalmology.  Tr. 259.  The chart notes from that exam reiterated Plaintiff's

13 conditions, and added:  "get new glasses ASAP."  Tr. 259.  The chart notes also

14 indicate that the examiner attempted to use pictures to measure Plaintiff's vision,

15 and the entry included "20/200 - on?[sic]"  Tr. 259.

16     The chart notes from Plaintiff's March 4, 2011, exam contain several hand-

17 written numbers.  Above the "CC" (an abbreviation for corrected vision), column,

18 a handwritten notation of "+400" appears.  Tr. 263.  Below "CC," on three separate

19 lines are the following: 200; 125; and 20/125ou.  Tr. 263.  Also, under "Near," is

20 written "20/60ou [sic]."  Tr. 263.

21     Plaintiff's chart notes from November 29, 2011, contain a circled "GL"

22 column,[2] and underneath a notation of "20/400 push" for the right eye and "20/60-

23 1 push" for the left eye.  Tr. 274.

24     Mark Thoman, M.D., a retired pediatrician, who specialized in "medical

25 toxicology," testified that Plaintiff did not meet or equal a listing.  Tr. 54, 101.

26 Plaintiff's counsel asked Dr. Thoman if Plaintiff's eye exam indicating her vision

27 

28 

---

[2]Dr. Thoman testified that "GL" means "needs new glasses basically."  Tr. 58.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 6

was 20/400 would meet the Listing, and Dr. Thoman indicated he was unable to decipher Plaintiff's most recent corrected vision measurement from the record:

> Q.    Yes, thank you, well, in Exhibit 8F, page two, it looks like the vision is listing at [20/400] there isn't it?
>
> A.    Yes.
>
> Q.    Doesn't that meet the listings then for vision?
>
> A.    Well, the [20/400] I'm looking at the eye test just before that and it corrects so is [20/400] the uncorrected or was it corrected and that exhibit was not clear on that because if you look at prior exhibits they did correct to at least 120, I mean, sorry, [20/125] or [20/100] so there's some other information that would indicate that that is the corrected vision than . . . [Listing] 102.02 because that is the [20/200] corrected to [20/200] [sic] and as you point out [20/400] so we know that the visual fields are intact.  We know that the extraocular motion was intact.  We know that there's macular, there's hypoplasia but what was corrected and I don't really see that.  I see the corrected vision on wearing glasses and the thing that's a new prescription but I don't really see the corrected vision based on what I saw on the previous thing so if there's information that indicates that that's the corrected vision then that certainly would put a different spin on it.

Tr. 56-57.  Dr. Thoman commented on Plaintiff's prescription strength, and admitted he should have contacted the clinic to ask for an explanation of the meaning of the record notations:

> Q.    They gave her a prescription for new glasses.
>
> A.    And it's a fairly significant prescription that you'd expect based on the previous eye checks.  I'm wondering if that was a type of procedure they did in order to dilate the pupils on the GL.  I probably should have called a clinic [to] find out what that meant this morning.  I would have to say I don't know for sure.

Tr. 58.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 7

The ALJ found that while Plaintiff "may suffer visual/eye disturbances due to her albinism, the evidence fails to demonstrate a lack of vision that cannot be accommodat[ed] with eyewear."  Tr. 26.

On review, it is unclear if the record supports the ALJ's conclusion.  The ophthalmologic chart notes are ambiguous and difficult to interpret.  Even the testifying medical expert admitted he did not know if the notes indicated that Plaintiff's vision was 20/400 corrected, or uncorrected.  In determining whether a vision impairment meets Listing 2.02, the difference between corrected and uncorrected vision determines whether the Plaintiff is disabled or not disabled.

"In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater,* 80 F.3d at 1288 (citation omitted).  This duty exists regardless of whether the claimant is represented by counsel.  *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003).  The duty to develop the record is triggered when the record is inadequate.  *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001). The record in this case is inadequate to determine if Plaintiff meets Listing 2.02, and on remand, the ALJ should reassess the opinions from all of Plaintiff's ophthalmology exams, if necessary, obtain additional medical evidence related to Plaintiff's eyesight, and finally, the ALJ should obtain expert medical testimony from an ophthalmologist.

**B.     The Functional Domains**

Plaintiff alternatively argues the ALJ erred in his findings related to whether Plaintiff's impairments functionally equal the Listings.  ECF No. 18 at 11-13.

Where a child's impairment does not meet or equal one of the Listings, the impairments are evaluated under a functional equivalency standard.  20 C.F.R. § 416.926a.  The ALJ is responsible for deciding functional equivalence after consideration of all evidence submitted.  20 C.F.R. § 416.926a(n).

The Regulations list the information and factors that are considered in determining whether a child's impairment functionally equals a Listing. 20 C.F.R. §§ 416.926a, 416.924a, 416.924b. In making this determination, the ALJ considers test scores together with reports and observations of school personnel and others. 20 C.F.R. §§ 416.924a(a); 416.926a(e)(4)(ii). The ALJ also considers how much extra help the child needs, how independent he is, how he functions in school, and the effects of treatment, if any. 20 C.F.R. § 416.926a(b). To functionally equal the listings, the impairments must be of listing-level severity, and must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

In general, in determining whether a child has a "marked" or an "extreme" limitation, the ALJ considers the child's functional limitations resulting from all of impairments, including "interactive and cumulative effects." 20 C.F.R. § 416.926a(e). Also in determining the severity of the child's impairment, the ALJ considers "all the relevant information," including signs, symptoms, laboratory findings, and descriptions about the child's functioning from parents, teachers, and others who know the child. 20 C.F.R. § 416.926a(e). The ALJ will consider how the child performs activities as compared to other children his age who do not have impairments. 20 C.F.R. § 416.926a(b).

### 1.    Evidence of Plaintiff's Functioning

On April 28, 2010, Plaintiff's preschool teacher Kristina Alton completed a Daycare/Preschool Questionnaire. Tr. 135-138. Plaintiff was in her care for approximately one year, beginning just after Plaintiff's second birthday, and ending just after her third birthday. Tr. 135. Ms. Alton responded with one-word answers to the 16 questions, and added a few comments under "additional concerns." Tr. 138. Ms. Alton answered "yes" to the questions that asked if Plaintiff could: (a) complete tasks she starts; (b) remain attentive and listen to

ORDER GRANTING PLAINTIFF'S MOTION . . . - 9

instruction; (c) stick to an activity; (d) remain seated and stay still; (e) think before acting; (f) learn new skills and keep up with peers; (g) participate in group situations; (h) get along with other children; (i) get along with adults; and (j) appears capable of caring for her personal needs.  Tr. 138.

Ms. Alton answered "no" to the questions that asked if Plaintiff: (a) had any problems with speech or hearing; (b) has any trouble standing, walking, or running; (c) is verbally or physically aggressive toward peers; (d) has difficulty expressing thoughts or feelings; and (e) needs special supervision.  Tr. 138.

Under "additional concerns," Ms. Alton noted that Plaintiff "displays obvious traits" of albinism.  Tr. 138.  Among other things, Ms. Alton noted that Plaintiff's eyes are sensitive to light and the classroom lights and sun "cause her to squint to an extent that her eyes are almost not visible."  Tr. 138.  Ms. Alton also reported that Plaintiff "also squints when focusing on specific items or when she is looking at books."  Tr. 138.  Ms. Alton concluded that Plaintiff was meeting her developmental goals, and was a "social, happy child who displays 'normal' behaviors, typical of a 2½ year old little girl."  Tr. 138.

Eleven months after completing the first questionnaire, on March 6, 2011, Ms. Alton provided an update to her report.  Tr. 267.  She indicated that Plaintiff left the daycare in October 2010.  Tr. 267.  In the six months following her initial report, Ms. Alton noticed "significant changes":  (1) Plaintiff's ability to learn new concepts was slower than her peers; (2) in her social skills, "she was reserved and tended to hang back from her peers;" and (3) she had difficulty focusing and had to squint to see, even while wearing glasses.  Tr. 267.

Plaintiff's mother, Nancy Guerrero, testified that Plaintiff was first prescribed eyeglasses just before she turned one year old.  Tr. 60.  Ms. Guerrero said Plaintiff now wears her glasses all the time.  Tr. 61.  Ms. Guerrero said that Plaintiff can see toys in her bedroom, but "she can't really see" new things, or in

ORDER GRANTING PLAINTIFF'S MOTION . . . - 10

new places.  Ms. Guerrero said that if Plaintiff is at a new playground, she "tends to fall off [playground equipment] quite easily.  She thinks that there's steps there that she can step on so she falls off the platforms."  Tr. 62.  Plaintiff also runs into poles, counters, tables, and cars.  Tr. 62.  Ms. Guerrero said her daughter can pedal a bike, but "she'll run into things pretty quickly."  Tr. 67.  She also said that when Plaintiff goes outside, she had to "always" watch her, to ensure she does not run into things.  Tr. 68.  If she is familiar with stairs, she can walk them, but if they are new steps, Plaintiff "crawls up them and scoots down on her bottom."  Tr. 63.

Plaintiff's mother said that at preschool, Plaintiff is learning to write letters, and it is hard for Plaintiff to tell certain letters apart, such as C's and O's.  Tr. 63. She has requested accommodation from the school for the classroom to use larger print, colored instead of white paper so it is less bright and easier to see, elevated papers on the desks, allowing Plaintiff to move to the front of the room, and use of a projector instead of a television screen.  Tr. 63.  Ms. Guerrero said that Plaintiff can read if the text is right in front of her.  Tr. 64.  She said Plaintiff complains she cannot see the television unless she is about six inches from the screen.  Tr. 64.  If Plaintiff's mother moves her back, Plaintiff will squint and move forward.  Tr. 64.

Ms. Guerrero said Plaintiff's glasses that she started wearing in November 2011, were an improvement over the last pair, but Plaintiff still had to squint:

Q.    Did she get new glasses when she went to the –

A.    Uh-huh, back in November.

Q.    Did they seem to help?

A.    They helped more than the last prescription that she had because her vision did get worse over the summer.

Q.    Is there any squinting?

A.    Uh-huh, still with the new glasses.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 11

Q.    Still.

BY THE ADMINISTRATIVE LAW JUDGE:

Q.    Have you been back to the eye doctor?

A.    Not yet.  She goes back once a year now, once a year.

Q.    I was saying, though if you noticed that new glasses are not doing what they're supposed to be doing, wouldn't you go back and tell the doctor?

A.    Yeah, but he said that at this point, we can't really tell how good it is for her because she can't tell you that this is better for me.  I can see all the way over there with these lens[es].  She just kind of freezes up in there so they just have to look inside and guess for themselves.

Tr. 64-65.

Ms. Guerrero said Plaintiff can see her food, "but she can't see what it is so oftentimes she doesn't, she's really picky about what she eats."  Tr. 65.  Ms. Guerrero also said that florescent lights are too strong for Plaintiff, and the doctor's office usually has to dim the lights during her visits.  Tr. 65.

**2.    Medical Opinions**

On July 22, 2010, non-examining physician Debra Iannuzzi, M.D., completed a Childhood Disability Evaluation form.  Tr. 252-257.  Dr. Iannuzzi assessed Plaintiff with no limitations in the first four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects.  Tr. 254-255.  In the domain of caring for yourself, Dr. Iannuzzi assessed Plaintiff's impairment as less than marked.  Tr. 255.  In the domain of health and physical well-being, she assessed Plaintiff's limitation as marked.  Tr. 255-257.

///

On March 18, 2011, non-examining physician Norman Staley, M.D., assessed Plaintiff with no limitations in the first four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects.  Tr. 266-267.  In the domain of caring for yourself, Dr. Staley assessed Plaintiff's impairment as less than marked, and provided Ms. Alton's updated report.  Tr. 267.  In the domain of health and physical well-being, Dr. Staley assessed Plaintiff's limitation as marked.  Tr. 267.

> ### a.   The Domains of Acquiring and Using Information; Attending and Completing Tasks; and Moving About and Manipulating Objects

The ALJ used identical reasons for finding Plaintiff had no impairment and less than marked impairment in three different domains:  (1) Acquiring and Using Information; (2) Attending and Completing Tasks; and (3) Moving About and Manipulating Objects.  Tr. 29, 30, 32.  The ALJ's reasoning, repeated thrice, was:

> [T]he child claimant's mother confirmed that the child had improved with new glasses in November 2011, and that she liked to color (which again demonstrates vision capability).  Her daycare teacher reported that at 2 ½ years old, the child claimant was able to complete/stick to tasks/activities she starts, remain attentive and listen to instruction, learn new skills, think before acting, keep up with peers, get along with others, participate in group situations, and had no problems with speech or hearing, standing/walking/running, or difficulty expressing her thoughts or feelings.

Tr. 29, 30, 32.

The first two broad reasons supplied by the ALJ are not supported by the record, and thus are not valid reasons upon which to determine the severity of Plaintiff's limitations in any of the three domains discussed.  These two issues are analyzed below, and the additional problems with the ALJ's analysis related to the specific domains are analyzed separately.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 13

First, the ALJ asserts, "the child claimant's mother confirmed that the child had improved with new glasses in November 2011." Tr. 29, 30, 32. Plaintiff's mother's statement was simply that November 2011 glasses "helped more than the last prescription." Tr. 64-65. Plaintiff's mother stated that Plaintiff still had to squint, even while wearing the glasses, and explained the difficulty of conducting a meaningful eye exam with her toddler. Tr. 65.

Moreover, it is not clear if the ALJ concluded broadly that all of Plaintiff's impairments "improved," when she obtained new glasses. The evidence revealed that while Plaintiff received new glasses, she still had to squint, lights were too bright, she still needed accommodations at school in order to see, and no evidence was introduced that Plaintiff's other mobility problems caused by her inability to see were resolved by the new glasses. Plaintiff's mother's statement that Plaintiff's November 2011 glasses "helped more" does not support the ALJ's conclusion that Plaintiff was "improved" to the extent her impairments caused no, or less than marked, limitations in her functioning in any of these three domains.

The ALJ's second broad reason applied to these three domains was that Plaintiff liked to color, and the ALJ concluded coloring "demonstrates vision capability." Tr. 29, 30, 32. However, the record does not support the ALJ's conclusion. Neither Plaintiff's mother nor Ms. Alton elaborated on whether Plaintiff could see what she was coloring and attempting to create pictures or color inside the lines, or whether she was simply putting colorful marks on paper. The fact that Plaintiff could hold a crayon or marker and touch it to paper does not necessarily support a conclusion that Plaintiff possessed unimpaired "vision capability."

Significantly, Plaintiff's mother testified that Plaintiff needed special accommodation in the classroom, such as use of larger than normal font sizes, colored paper, a different screen, and careful placement of Plaintiff's desk. All of

ORDER GRANTING PLAINTIFF'S MOTION . . . - 14

these accommodations were necessary so that Plaintiff could see, and the ALJ's conclusion that Plaintiff demonstrated "vision capability" by virtue of the fact she "liked to color" is not a reasonable inference, and thus does not support the ALJ's findings of no impairment/less than marked impairment in the three domains.

### (i)    Acquiring and Using Information

In the acquiring and using information domain, the ALJ considers "how well the child acquires or learns information, and how well the child uses the information learned." 20 C.F.R. § 416.926a(g). The regulations describe the standard against which the child's abilities are compared:

> Older infants and toddlers (age 1 to attainment of age 3). At this age, you are learning about the world around you. When you play, you should learn how objects go together in different ways. You should learn that by pretending, your actions can represent real things. This helps you understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. You should refer to yourself and things around you by pointing and eventually by naming. You should form concepts and solve simple problems through purposeful experimentation (e.g., taking toys apart), imitation, constructive play (e.g., building with blocks), and pretend play activities. You should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions.

20 C.F.R. § 416.926a(g)(2)(ii). The ALJ found Plaintiff had less than marked limitations in acquiring and using information. Tr. 29.

The portion of the ALJ's general analysis that may apply to this domain[3] is the teacher's report that Plaintiff was able to "learn new skills," in finding that

---

[3]Another problem created by the decision's repetition and general, identical analyses is that the ALJ failed to specifically identify Plaintiff's particular traits considered under each functional domain. On remand, the ALJ will identify with

ORDER GRANTING PLAINTIFF'S MOTION . . . - 15

1  Plaintiff had less than marked limitations.  Tr. 29.  However, the March 6, 2011,

2  update to the report related that some of Plaintiff's abilities had significantly

3  changed over time.  In part, Ms. Alton reported that Plaintiff's ability to learn new

4  concepts was slower than her peers.  Tr. 267.  The ALJ's analysis for this domain

5  failed to acknowledge the updated information, and it is unclear if the ALJ

6  considered the new information.  As such, the analysis is inadequate.

7  (ii)      <strong>Moving About and Manipulating Objects</strong>

8       In the domain of moving about and manipulating objects, the ALJ considers

9  "how you move your body from one place to another and how you move and

10 manipulate things. These are called gross and fine motor skills."  20 C.F.R. §

11 416.926a(j).  The regulations describe the standard against which the child's

12 abilities are compared:

13       At this age, you should begin to explore actively a wide area of your
14       physical environment, using your body with steadily increasing control
         and independence from others.  You should begin to walk and run
15       without assistance, and climb with increasing skill.  You should
         frequently try to manipulate small objects and to use your hands to do
16       or get something that you want or need.  Your improved motor skills
         should enable you to play with small blocks, scribble with crayons, and
17       feed yourself.
18

19 20 C.F.R. § 416.926a(j)(2)(ii).  The ALJ found Plaintiff had less than marked

20 limitations in moving about and manipulating objects.  Tr. 32.

21       The portion of the ALJ's analysis that may apply to the Moving About and

22 Manipulating Objects domain, is Ms. Alton's report that Plaintiff "had no problems

23

   _____

24 particularity the evidence considered under each domain.  *Cf., Reddick v. Chater,*

25 157 F.3d 715, 725 (9th Cir. 1998) (an ALJ should provide "a detailed and thorough

26 summary of the facts and conflicting clinical evidence, stating his interpretation

27 thereof, and making findings").

28

   ORDER GRANTING PLAINTIFF'S MOTION . . . - 16

with . . . standing/walking/running." Tr. 32.  The regulations provide that Plaintiff

should be able "to climb stairs and playground equipment with little supervision,

and let her play more independently (e.g., wing by herself and ride a tricycle)." Tr.

32.  Ms. Guerrero testified that Plaintiff cannot be unsupervised at playgrounds,

because "she tends to fall off quite easily," and she cannot properly see steps.  Tr.

62.  Also, Ms. Guerrero testified that Plaintiff tends to run into objects, and while

she can pedal a bike, she often runs into obstacles if she is left unsupervised.  Tr.

68.  Finally, Ms. Guerrero testified that Plaintiff is able to readily navigate only

familiar stairs, and if the stairs are unfamiliar, she "crawls up them and scoots

down on her bottom." Tr. 63.  The ALJ failed to address the relevant evidence

from Ms. Guerrero related to this domain.

The regulations provide that an ALJ is to consider "all the relevant

information," including descriptions about the child's functioning from parents.

20 C.F.R. § 416.926a(e).  While an ALJ need not discuss all evidence presented,

the ALJ must explain why significant probative evidence has been rejected.

*Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984).  Here, the ALJ

failed to address, and failed to explain why he rejected Ms. Guerrero's testimony

about Plaintiff's difficulty related to moving.  This analysis was legally

insufficient.

### b.    The Domains of Caring for Yourself and Health and Physical Well-Being

In the Caring for Yourself domain, the ALJ considers "how well you

maintain a healthy emotional and physical state, including how well you get your

physical and emotional wants and needs met in appropriate ways; how you cope

with stress and changes in your environment; and whether you take care of your

own health, possessions, and living area." 20 C.F.R. § 416.926a(k).  The

regulations describe the standard against which the child's abilities are compared:

ORDER GRANTING PLAINTIFF'S MOTION . . . - 17

As you grow, you should be trying to do more things for yourself that increase your sense of independence and competence in your environment.  You might console yourself by carrying a favorite blanket with you everywhere.  You should be learning to cooperate with your caregivers when they take care of your physical needs, but you should also want to show what you can do; e.g., pointing to the bathroom, pulling off your coat.  You should be experimenting with your independence by showing some degree of contrariness (e.g., "No! No!") and identity (e.g., hoarding your toys).

20 C.F.R. § 416.926a(k)(2)(ii).

In the Health and Physical Well-Being domain, the ALJ considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in paragraph (j) of this section."  20 C.F.R. § 416.926a(l).  The regulation contemplates that when an impairment, or combination of impairments has "physical effects that cause "extreme" limitation in your functioning, you will generally have an impairment(s) that 'meets' or 'medically equals' a listing."  20 C.F.R. § 416.926a(l).

The reasons the ALJ provided in analyzing the domains of Caring for Yourself, and Health and Physical Well-being were also identical to one another, save the few introductory words:

[O]ther than being prescribed eyeglasses, and being sensitive to light, the child claimant has apparently maintains [sic] adequate vision acuity with prescription eyewear with no symptoms of nystagmus. Reports of 'squinting' demonstrates her ability to notify others of her need for improved eyewear, and her mother reported/confirmed that with new eye glasses the child claimant had improved and her daycare teacher reported that she did not have any problems with speech or hearing, standing/walking/running, and did not require special supervision.

Tr. 33, 34.

ORDER GRANTING PLAINTIFF'S MOTION . . . - 18

Several of these reasons provided by the ALJ are not supported by the record.  First, the ALJ asserts that Plaintiff "apparently maintains adequate vision acuity with prescription eyewear with no symptoms of nystagmus."  Tr. 33, 34.  The record reveals that Plaintiff, despite newly updated eyeglasses, has to squint to see, even while wearing glasses.  Tr. 64-65, 138, 267.  The fact that Plaintiff struggles to see, even while wearing glasses, directly contradicts the ALJ's conclusion that Plaintiff maintains adequate vision acuity.

Equally suspect is the ALJ's conclusion that "squinting demonstrates [Plaintiff's] ability to notify others of her need for improved eyewear."  Tr. 33, 34.  The record reveals that Plaintiff seems to squint not only when she is trying to see, but also in sunlight or when the lighting is too bright for her.  Tr. 64-65, 138, 267.  As such, the ALJ's conclusion that Plaintiff's squinting demonstrates her ability to notify others when she needs new prescription lenses is not supported by the record.

Additionally, the ALJ asserted that Plaintiff exhibits "no symptoms of nystagmus," yet the record reveals from several sources that Plaintiff in fact has nystagmus.  Tr. 33, 34, 138 ("Her eyes move rapidly back and forth."), 195 ("nystagmus" diagnosis), 196 ("nystagmus" diagnosis), 197 ("nystagmus" diagnosis), 198 ("nystagmus" diagnosis), 259 ("nystagmus" diagnosis), 260 ("nystagmus" diagnosis), 263 ("nystagmus" diagnosis), 264 (under impairments: nystagmus), 274.  The ALJ's conclusion that Plaintiff showed no symptoms of nystagmus is directly contradicted by the record.

Also, the ALJ concluded, apparently based entirely upon Ms. Alton's report, that Plaintiff had no problems with "standing/walking/running, and did not require special supervision."  Tr. 33, 34.  Yet, as analyzed above, Plaintiff's mother reported that Plaintiff's vision caused her substantial problems in walking, running, biking and playing on playground equipment, and, as a result, Plaintiff required

ORDER GRANTING PLAINTIFF'S MOTION . . . - 19

special supervision.  Tr. 62-68.  The ALJ did not address this probative evidence from Ms. Guerrero, and thus this analysis is insufficient.

Finally, the ALJ failed to address two non-examining physician opinions that assessed Plaintiff with marked limitations in the Health and Well-being domain.  Tr. 255-257, 267.  An ALJ may not reject the opinion of a non-examining physician without explanation or analysis.  *See Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1996).  In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it.  SSR 96-6p.  A non-examining doctor's opinion may constitute substantial evidence if it is consistent with other independent evidence in the record.  *Thomas*, 278 F.3d at 957.  The ALJ's failure to address and explain why he rejected the opinions from both Dr. Iannuzzi and Dr. Staley was error.

### c.    The Domain of Interacting and Relating with Others

In the domain of interacting and relating with others, the ALJ considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."  20 C.F.R. § 416.926a(i).  The regulations describe the standard against which the child's abilities are compared:

> At this age, you are dependent upon your caregivers, but should begin to separate from them.  You should be able to express emotions and respond to the feelings of others.  You should begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children your age. You should be able to spontaneously communicate your wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know you can understand what you say most of the time.

20 C.F.R. § 416.926a(i)(2)(ii).

ORDER GRANTING PLAINTIFF'S MOTION . . . - 20

The ALJ found that Plaintiff had no impairments in interacting and relating with others. Tr. 31. The ALJ relied upon Plaintiff's mother's report that the Plaintiff played with her cousins, and her teacher's statement that she gets along with others, keeps up with her peers, participates in group discussions and does not have any problems expressing her thoughts and feelings. Tr. 31.

In this analysis, the ALJ failed to address the March 6, 2011, report from Ms. Alton which noted significant changes she observed in Plaintiff's behavior. Tr. 267. Specifically, Ms. Alton had observed that during Plaintiff's final months at the daycare center, Plaintiff "was reserved and tended to hang back from her peers." Tr. 267. The ALJ's failure to address this probative evidence renders this analysis inadequate.

## CONCLUSION

In this case, remand is necessary for multiple reasons. On remand, the ALJ shall develop the record regarding Plaintiff's corrected vision acuity, and obtain testimony from a qualified ophthalmologist to interpret Plaintiff's medical records. After the ALJ has developed the record, he shall reconsider whether Plaintiff meets the applicable listings.

Additionally, on remand the ALJ shall also reconsider whether Plaintiff's impairments meet the functional equivalency standards, and provide a detailed and thorough summary of the facts and clinical evidence specific to each domain, state his interpretation thereof, and provide specific findings, as detailed herein. *See Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir. 1988). Similarly, the ALJ must explain the weight assigned to "other" sources to the extent that a claimant or subsequent reviewer may follow the ALJ's reasoning. SSR 06-03p. Accordingly, **IT IS HEREBY ORDERED**:

///

///

ORDER GRANTING PLAINTIFF'S MOTION . . . - 21

1.      Plaintiff's Motion for Summary Judgment, **ECF No. 18**, is **GRANTED.**  The matter is remanded to the Commissioner for additional proceedings pursuant to sentence four 42 U.S.C. 405(g).

2.      Defendant's Motion for Summary Judgment, **ECF No. 22**, is **DENIED.**

3.      An application for attorney fees may be filed by separate motion.

The District Court Executive is directed to file this Order and provide copies to counsel. Judgment shall be entered for Plaintiff and the file shall be **CLOSED**.

DATED August 26, 2014.



_____
JOHN T. RODGERS
UNITED STATES MAGISTRATE JUDGE

ORDER GRANTING PLAINTIFF'S MOTION . . . - 22